FILED

2025 Jun-30  PM 12:56
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **JOEY LANE GRAHAM,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **COMMISSIONER, SOCIAL** | ) | **Case No.: 2:24-cv-1248-AMM** |
| **SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OF DECISION

Plaintiff Joey Lane Graham brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying his claim for supplemental security income. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On September 9, 2021, Mr. Graham protectively filed an application for supplemental security income under Title XVI of the Act, alleging disability beginning February 1, 2020. R. 10, 70–75. Mr. Graham alleges disability due to stints in groin and abdomen, trouble walking due to damaged nerves in legs, high

blood pressure, and depression. R. 71. He has at least a high school education and past relevant work as a lubrication servicer. R. 27–28.

The Social Security Administration ("SSA") initially denied Mr. Graham's application on March 17, 2022, and again denied it upon reconsideration on June 1, 2023. R. 10, 70–85. On June 30, 2023, Mr. Graham filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10. That request was granted. R. 136–38, 159–64. Mr. Graham appeared and testified at a hearing before ALJ Monica D. Jackson on November 9, 2023. R. 10, 36–69. On February 22, 2024, ALJ Jackson issued a decision, finding that Mr. Graham had not been under a disability since the date the application was filed, September 9, 2021. R. 7–29. Mr. Graham was fifty-three years old at the time of the ALJ decision. R. 27, 29.

Mr. Graham appealed to the Appeals Council, which denied his request for review on July 9, 2024. R. 1–3. After the Appeals Council denied Mr. Graham's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On September 12, 2024, Mr. Graham sought this court's review of the ALJ's decision. *See* Doc. 1.

## II. The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 416.920. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities."
20 C.F.R. § 416.972(a). "Gainful work activity" is work that is done for pay or profit.
20 C.F.R. § 416.972(b). If the ALJ finds that the claimant engages in substantial
gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 416.920(b).
*Second*, the ALJ must determine whether the claimant has a medically determinable
impairment or a combination of medical impairments that significantly limits the
claimant's ability to perform basic work activities. 20 C.F.R. § 416.920(a)(4)(ii), (c).
Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ
must determine whether the claimant's impairment meets or medically equals the
criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20
C.F.R. §§ 416.920(d), 416.925, 416.926. If such criteria are met, the claimant is
declared disabled. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared
disabled under the third step, the ALJ still may find disability under the next two
steps of the analysis. The ALJ must first determine the claimant's residual functional
capacity, which refers to the claimant's ability to work despite his impairments. 20
C.F.R. §§ 416.920(e), 416.945. In the *fourth* step, the ALJ determines whether the
claimant has the residual functional capacity to perform past relevant work. 20
C.F.R. § 416.920(a)(4)(iv). If the ALJ determines that the claimant is capable of
performing past relevant work, then the claimant is deemed not disabled. *Id*. If the

3

ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 416.920(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with his residual functional capacity, age, education, and work experience. 20 C.F.R. § 416.920(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 416.920(g)(1), 416.960(c).

The ALJ found that Mr. Graham had not engaged in substantial gainful activity since his alleged onset date, February 1, 2020. R. 12. The ALJ decided that Mr. Graham had the following severe impairments: obesity, bipolar disorder, cocaine abuse, cannabis abuse, amphetamine abuse, peripheral artery disease, status post bilateral common iliac artery stenting, aortic and right femoral endarterectomy, ischemic neuropathy, and hypertensive disorder. R. 13. The ALJ decided that Mr. Graham's orthopedic impairments were non-severe because they "would have no more than a minimal effect on [his] ability to perform basic work activities." R. 13. Overall, the ALJ determined that Mr. Graham did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments" to support a finding of disability. R. 13.

The ALJ found that Mr. Graham had the "residual functional capacity to perform light work" with certain limitations. R. 18. The ALJ determined that Mr. Graham may: occasionally operate foot controls; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. R. 18. The ALJ also determined that Mr. Graham must never: climb ladders, ropes, or scaffolds. R. 18. The ALJ determined that Mr. Graham would need to change positions from standing/walking to sitting for fifteen minutes after every one hour of standing or walking and he could remain on task while sitting, standing, or walking. R. 18. The ALJ also determined that Mr. Graham can: understand, remember, and carry out simple instructions and make simple work-related decisions; work at a consistent pace throughout the workday, but cannot perform specific production rate pace work such as assembly line work or work requiring hourly quotas; tolerate occasional interaction with coworkers, supervisors, and the public; and tolerate occasional changes in work setting. R. 18.

According to the ALJ, Mr. Graham is unable to perform his past relevant work of lubrication servicer. R. 27. According to the ALJ, Mr. Graham is an individual "closely approaching advanced age," and he has "at least a high school education," as those terms are defined by the regulations. R. 27–28. The ALJ determined that "[t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that [Mr. Graham] is 'not disabled.'" R. 28. Because Mr. Graham's "ability to perform

all or substantially all of the requirements of [light] work has been impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain "the extent to which these limitations erode the unskilled light occupational base." R. 28. That expert testified that such individual "would be able to perform the requirements of representative occupations such as an electrical accessory assembler. . . ; and mail clerk." R. 29 (cleaned up).

Based on these findings, the ALJ concluded that Mr. Graham had not been under a disability, as defined in the Act, since September 9, 2021. R. 11, 29. Mr. Graham now challenges that decision.

## III.    Standard of Review

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision and whether the correct legal standards were applied. *See* 42 U.S.C. § 405(g); *Walker v. Soc. Sec. Admin, Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021); *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole

and determine if the decision "is reasonable and supported by substantial evidence." *See Martin*, 894 F.2d at 1529 (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *Id*. No decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## IV. Discussion

Mr. Graham alleges that the ALJ's decision should be reversed because the "ALJ erred by rejecting consideration of the hypothetical questions posed to the vocational expert by [Mr. Graham's] representative," which Mr. Graham argues "confirm[ed] that there is no competitive employment that a person could perform

if they need to elevate their legs two hours in an eight-hour work day, or if they are off task twenty-percent of the work day." Doc. 9 at 8, 10 (cleaned up). Mr. Graham alleges that "[t]he ALJ's explanation of the rejection of [his] attorney's hypothetical questions is inadequate" and it "was not supported by substantial evidence." *Id.* at 9–10.

The Commissioner argues that Mr. Graham "has not, either at the administrative hearing or before this [c]ourt, pointed to any evidence that actually supports the limitations hypothesized." Doc. 15 at 2. The Commissioner argues that Mr. Graham "has made no meaningful showing that [the elevation and task] limitations should have been included in the [residual functional capacity] and now argues for nothing more than the conclusory proposition that the ALJ should have included [residual functional capacity] limitations simply because [Mr. Graham's] attorney asked unfounded hypothetical questions at the administrative hearing." *Id.* at 6.

"In order for a Vocational Expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

After considering the "entire record," the ALJ found that Mr. Graham has:

> the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except occasional operation of foot controls[, and] he would need to change positions from standing/walking to sitting for 15 minutes after every one hour of standing or walking; he can remain on task while sitting, standing or walking; occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs; never climb ropes, ladders or scaffolds; he can understand, remember and carry out simple instructions and make simple work related decisions; he can work at a consistent pace throughout the workday but cannot perform specific production rate pace work such as assembly line work or work requiring hourly quotas; he can tolerate occasional interaction with coworkers, supervisors and the public; and he can tolerate occasional changes in work setting.

R. 18. At the administrative hearing, the ALJ posed a hypothetical question and a series of follow-up questions to the vocational expert. R. 63–66. The ALJ's hypothetical question incorporated part of the residual functional capacity that she crafted after her review of the record:

> Q: . . . If you would, assume a hypothetical individual of the claimant's age and education and with the past job that you described. Further assume that this individual is limited to light work as defined in the Regulations. The individual can occasionally operate foot controls, would need the option to change positions from standing or walking to sitting from 15 minutes after every one hour of standing or walking, can remain on task while sitting, standing or walking.
>
> The individual can occasionally balance, stoop, kneel, crouch, crawl and climb ramps and stairs, but never climb ropes, ladders or scaffolds. Can this individual perform the past job or any jobs in the national economy?

> A: . . . [O]ne occupation that would be consistent with
> these limitations is an electrical inspector and assembler.
> That DOT code is 729.687-010, this is unskilled, light
> work with an SVP-2. There are approximately 285,000 in
> the national economy. A second example is a mail clerk.
> That DOT code is 209.687-026, this is unskilled work with
> an SVP-2 with a light exertion level and there are
> approximately 84,000 in the national economy.
>
> A third example is floor attendant. That DOT code is
> 343.467-014, this is unskilled work with an SVP-2 with a
> light exertion level. There are approximately 388,000 in
> the national economy.

R. 63–64. The ALJ continued by asking if the use of a wheelchair would affect these

positions. R. 64. The vocational expert testified that all three positions would remain

if a wheelchair was required. R. 65. The ALJ's next follow-up question to the

hypothetical question incorporated the remaining impairments incorporated into Mr.

Graham's residual functional capacity:

> Q: . . . [I]f you would, assume the same facts as
> hypothetical individual number one, except this
> hypothetical individual can understand, remember and
> carry out simple instructions and make simple work-
> related decisions, can work at a consistent pace throughout
> the workday, but cannot perform specific production rate
> pace work such as assembly line work or work requiring
> hourly quotas, can tolerate occasional interaction with
> coworkers, supervisor and the public. Can tolerate
> occasional changes in work setting. Can that individual
> perform the past jobs or any work in the national
> economy?
>
> A: . . . In terms of the occupations we were discussing, the
> floor attendant occupation does involve working with the
> public as part of the job. Because of that, the person could

> not perform that specific occupation. But, the other two occupations, the mail clerk and the electrical inspector may not require an individual to work in tandem with other employees. They're not production type, they're not assembly line occupations, so the person would be able to perform those occupations.

R. 65–66; *see also* R. 18.

After the ALJ's questioning ended, Mr. Graham's attorney examined the vocational expert. R. 67–68. Mr. Graham's attorney first asked the vocational expert if the ALJ's "hypothetical individual would have the need to elevate their legs to the waist level for a total of two hours in an eight-hour period, exclusive of customary breaks, what effect, if any, would that have on the jobs that were specified as available in the economy?" R. 67. The vocational expert testified that employers would "not tolerate" "[t]he need to elevate to that level" "while the individual is actively working." R. 67. Thus, the vocational expert testified that "[t]his person would not meet employer standards and I would not be able to identify any work that this person could sustain on a continuing full-time basis." R. 67.

Then Mr. Graham's attorney asked the vocational expert if the ALJ's hypothetical individual "would be off task for a total of 20 percent of the workday on a daily basis in addition to customary work breaks, what effect, if any, would that have on the jobs that you specified were available and other work in the economy?" R. 67–68. The vocational expert testified that "[t]he time off task . . . is something [employers] don't tolerate in these types of unskilled occupations. Again, because

11

the person would not meet employer's standards, I could not identify any full-time, competitive employment that this person could sustain." R. 68.

The ALJ's decision indicates that she considered Mr. Graham's hearing testimony regarding elevating his legs. Included in the discussion of residual functional capacity is a recitation of Mr. Graham's hearing testimony that he "sits and elevates his legs for about 2 hours in an 8-hour day." R. 19. After discussing the medical evidence of record, the ALJ stated that "the objective medical evidence does not fully support [Mr. Graham's] allegations of disabling symptoms such as limited ability to stand, sit, or walk for prolonged periods." R. 23. The ALJ cited Mr. Graham's "non-compliance with treatment such as a significant gap in treatment of over 2 years." R. 23. And the ALJ also noted that Mr. Graham's "progress notes show that [he] significantly improved after he was discharged from his second hospital intervention in February 2022." R. 23.

In her decision, the ALJ also specifically rejected the hypothetical questions posed by Mr. Graham's attorney:

> The undersigned rejects the further hypothetical question[s] posed by [Mr. Graham's] representative to the vocational expert, as the objective evidence of record does not support them. Accordingly, in the opinion of the undersigned, the limitations propounded to the vocational expert prior to questioning by [Mr. Graham's] representative contain all inferences regarding [Mr. Graham's] impairments and the degree of severity thereof which are raised by the objective evidence of record. In response to questions posed by the undersigned, the

12

vocational expert testified that there are jobs [Mr. Graham] can perform despite [his] limitations. The undersigned finds the numbers given to be significant.

R. 29 (cleaned up).

Mr. Graham argues there is error in the ALJ's treatment of the vocational expert testimony, however, in his brief, Mr. Graham does not point to specific, objective evidence to support his claims. *See generally* Doc. 9. Instead, Mr. Graham states that "[t]he objective evidence of record pertaining to [his] impairments affecting his lower extremities, i.e., peripheral artery disease, status post bilateral common iliac artery stenting, aortic and right femoral endarterectomy, ischemic neuropathy, provide substantial objective evidence and a plausible basis to support the hypothetical questions posed by [Mr. Graham's] attorney." *Id.* at 10. However, in forming the residual functional capacity, the ALJ thoroughly reviewed the objective medical evidence of record, R. 20–22. When crafting the residual functional capacity, the ALJ made specific findings why the objective medical evidence "does not fully support [Mr. Graham's] allegations of disabling symptoms." R. 23.

The ALJ included all of the limitations in Mr. Graham's residual functional capacity in the first hypothetical she posed to the vocational expert, as modified by her follow-up question. Therefore, the vocational expert's testimony was based on a

proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

Although Mr. Graham argues that the ALJ should have considered the vocational expert's testimony in response to his attorney's questions regarding the need to elevate his legs and off task tolerance, the ALJ did not include these limitations in her residual functional capacity. Therefore, the vocational expert's testimony on these points is not relevant to the residual functional capacity questions as posed by the ALJ. There is no error in the ALJ's consideration of the vocational expert testimony.

## V.    Conclusion

Upon review of the administrative record, the court finds the Commissioner's decision is supported by substantial evidence and in accord with the applicable law. A separate order will be entered.

**DONE** and **ORDERED** this 30th day of June, 2025.



**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE